**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Not For Publication

-----------------------------------------------------x
                                                      :
In re                                                 :        Chapter 11
                                                      :
ENRON CORP., et al.,                                  :        Case No. 01-16034 (AJG)
                                                      :
                    Reorganized Debtors.              :        (Confirmed)
                                                      :
-----------------------------------------------------x
                                                      :
RUFUS T. DORSEY, IV, EXAMINER                         :
FOR NEWPOWER HOLDINGS, INC.,                          :
AND TNPC HOLDINGS, INC.,                              :
                                                      :
                    Plaintiff,                        :
                                                      :
              v.                                      :        Adv. Proc. No. 04-04303 (AJG)
                                                      :
ENRON CORP.,                                          :
ENRON NORTH AMERICA CORP.,                            :
ENRON ENERGY SERVICES, INC.,                          :
ENRON POWER MARKETING, INC.,                          :
ENRON ENERGY SERVICES, LLC,                           :
CORTEZ ENERGY SERVICES, LLC,                          :
MCGARRET I, LLC,                                      :
MCGARRET II, LLC,                                     :
MCGARRET III, LLC, and                                :
EES WARRANT TRUST,                                    :
                                                      :
                    Defendants.                       :
                                                      :
-----------------------------------------------------x

## OPINION REGARDING DEFENDANTS' MOTION TO DISMISS ADVERSARY COMPLAINT OF NEW POWER EXAMINER FOR FAILURE TO STATE A CLAIM

**APPEARANCES:**

WEIL, GOTSHAL & MANGES LLP
Counsel for Reorganized Debtors
        Enron Corp. and certain of its subsidiaries and affiliates as
        Defendants

767 Fifth Avenue
New York, NY 10153

      Martin J. Bienenstock, Esq.
      Brian S. Rosen, Esq.
            Of Counsel

700 Louisiana, Suite 1600
Houston, TX 77002

      Stephen T. Loden, Esq.
            Of Counsel


PARKER, HUDSON, RAINER & DOBBS, LLP
Counsel for Plaintiff Rufus T. Dorsey, IV
      Examiner for NewPower
      Holdings, Inc. and TNPC Holdings, Inc.

1500 Marquis Two Tower
285 Peachtree Center Avenue
Atlanta, GA 30303

      Rufus T. Dorsey, IV, Esq.
      Jack C. Basham, Jr., Esq.
            Of Counsel


ARTHUR J. GONZALEZ
United States Bankruptcy Judge

      The matter before the Court involves a claim (the "Claim") asserted by Enron

Corp. and certain of its subsidiaries and affiliates (together, "Enron," or the

"Defendants"), in the chapter 11 cases of The New Power Company ("New Power"),

NewPower Holdings, Inc. ("Holdings") and TNPC Holdings, Inc. ("TNPC," and together

with New Power and Holdings, the "New Power Debtors").[1]  The underlying transaction

upon which the Claim is based has been the subject of two separate settlement

---

[1]  On October 7, 2002, Enron filed proofs of claim in each of the New Power Debtors' chapter 11 cases, asserting a single claim in the amount of $28 million, plus interest and reasonable costs, based upon amounts due and owing under the Note (as defined below).  Pursuant to the New Power Debtors' First Omnibus Objection to Allowance of Certain Claims, dated November 19, 2002, Enron's duplicative proofs of claim were expunged, leaving claim number 718 as the remaining claim.

agreements, each of which was approved pursuant to Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").  The examiner appointed in the New

Power Debtors' chapter 11 cases (the "New Power Cases")[2] filed the instant adversary

proceeding before this Court seeking to (1) recharacterize the Claim as an equity interest,

and (2) equitably subordinate Enron's equity interests, including the putative

recharacterized Claim, in the New Power Debtors.[3]  The issues presented to the Court are

(1) whether the withdrawal of the Claim precludes an action to recharacterize it, (2)

whether the release contained in the First Settlement (as defined below) applied to the

Claim and whether such release became effective, and, if not, (3) whether either or both

of the prior settlement agreements preclude the litigation of certain disputes, including

recharacterization, under the Master Agreement (as defined below) under principles of

res judicata, and (4) whether either the release or settlement agreements preclude

equitable subordination of Enron's equity interests.  Upon review of the parties'

pleadings and arguments made at the hearing on this matter, the Court finds that (1) the

Claim has been withdrawn and therefore cannot be recharacterized, (2) the Claim has

been released and any cause of action to recharacterize the Claim is barred by the release,

(3) to the extent the Claim were not found to have been released, recharacterization of the

Claim is barred by res judicata, (4) equitable subordination of any putative

recharacterized amount is moot, and (5) neither the settlement agreements nor the

principles of res judicata bar equitable subordination of Enron's existing equity interests.

---

[2]   The New Power Cases were filed in the United States Bankruptcy Court for the Northern District of
Georgia, Case Nos. 02-10835 through 02-10837.
[3]   Enron controls approximately 44 percent of the New Power Debtors' issued and outstanding common
stock, including, as of the New Power Petition Date (as defined below), 13,650,400 shares of New Power
stock and 42,134,200 warrants.  (Complaint ¶ 301, Mot. To Dismiss ¶ 3.)

# I. Background

**A.**    *The First Settlement*

On March 14, 2001, Enron entered into the Master Cross-Product Netting, Setoff,
and Security Agreement (as amended, the "Master Agreement") with New Power and
certain of its affiliates.  The Master Agreement dealt with a series of commodity purchase
and swap transactions related to power and natural gas.  The Master Agreement granted
Enron approximately $70 million in collateral from New Power, as well as secured
claims against New Power for an additional $28 million.  An amendment to the Master
Agreement gave Enron a blanket security interest in substantially all of New Power's
assets.  On October 18, 2001, pursuant to a further amendment of the Master Agreement,
Enron provided New Power with a line of credit in the amount of $40 million.

On December 2, 2001 (the "Enron Petition Date"), Enron and certain of its
subsidiaries and affiliates (together, the "Enron Debtors") filed voluntary petitions for
relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")
with this Court (the "Enron Cases").  Subsequently, New Power entered into negotiations
with various third parties for the sale of New Power's issued and outstanding stock.  In
connection with a proposed tender offer, New Power was required by the potential
purchasers to sever certain contractual relationships with Enron.  Therefore, Enron and
New Power negotiated the termination and settlement of all amounts and obligations
otherwise due under certain contracts between the parties, including the Master
Agreement (the "First Settlement").  The First Settlement provided for, among other
things, (a) foreclosure of the approximately $70 million in collateral that New Power had
pledged to Enron, (b) issuance of a secured promissory note by New Power to Enron in
the amount of $28 million (the "Note"), and (c) a mutual release of all rights, duties and

obligations arising in and under the applicable contracts (including the Master

Agreement) upon payment of the Note.[4]   On March 28, 2002, this Court entered an order

approving the First Settlement pursuant to Bankruptcy Rule 9019 (the "First Settlement

Order").

**B.**      ***The Second Settlement***

On June 11, 2002 (the "New Power Petition Date"), the New Power Debtors filed

voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United

States Bankruptcy Court for the Northern District of Georgia (the "Georgia Bankruptcy

Court").   On July 11, 2002, the Georgia Bankruptcy Court granted final approval for the

New Power Debtors' use of cash collateral, subject to the security interest and lien of

Enron (the "Cash Collateral Order").   The Cash Collateral Order provided for the

payment of Enron's claim against the New Power Debtors from the proceeds of a sale of

the New Power Debtors' assets.   However, the extent to which the claims and interests of

Enron would constitute an allowed claim in the New Power Cases was subject to further

order of the Georgia Bankruptcy Court.

The Cash Collateral Order also fixed a deadline of October 7, 2002[5] for the

official committee of unsecured creditors appointed in the New Power Cases (the

"Committee") to commence a proceeding to contest the claims or prepetition liens of

Enron.   If the Committee failed to commence an action by that date, "any such objections

that the Committee could have brought to the amount of the Enron Creditors' claim or

---

[4]   The First Settlement stated that "upon payment in full of all principal and accrued and unpaid interest
under the Note . . . Enron, New Power and each of the parties to the Commodities Contracts on behalf of
themselves and each of their respective Subsidiaries shall be FULLY, COMPLETELY AND FOREVER
RELEASED . . . from all rights, duties and obligations accrued, contingent or otherwise (whether past,
present, future or otherwise and whether at law or in equity) in and under the Commodities Contracts . . . ."
(First Settlement ¶ 5(a)) (emphasis in original).
[5]   The Georgia Bankruptcy Court subsequently extended this deadline to November 4, 2002.

their Pre-Petition Lien [were to] be thereafter forever waived and barred." (Cash Coll. Order ¶ 9.)

On October 7, 2002, Enron filed the Claim. Subsequently, the Committee chose to let the deadline to file an action to contest the claims or prepetition liens of Enron pass. On November 5, 2002, the New Power Debtors paid Enron the full amount of the principal and all accrued interest due under the Note.

On November 25, 2002, the New Power Debtors filed an objection to Enron's Claim (the "Claim Objection"), stating that "[t]he only possible claim of the Enron Creditors remaining after Debtors' payment of the principal and interest under the Note is for payment of the Enron Creditors' reasonable costs of collection to the extent provided for under the Note . . . ." (Claim Obj. ¶ 12.) Despite several requests, Enron failed to provide documentation supporting such costs. Since the principal and interest on the Note had been paid in full, the New Power Debtors sought disallowance in full and expungement of Enron's Claim, as well as the release of Enron's liens on the property of the New Power Debtors' estates.

On November 26, 2002, Riverside Contracting, LLC ("Riverside"), a postpetition purchaser of claims and equity interests in the New Power Cases, filed a motion for appointment of an official committee of holders of the New Power Debtors' common stock (the "Equity Committee Motion"), noting that there was no party representing the interests of equity holders in the New Power Cases. (Equity Comm. Mot. ¶ 46.) The Equity Committee Motion attached a letter from the UST, dated November 15, 2002, stating that the UST had decided not to appoint an equity committee, but would instead seek appointment of an examiner. (Equity Comm. Mot. Ex. C.) The New Power Debtors, the UST and Enron each filed objections to the Equity Committee Motion.

6

On December 2, 2002, the United States Trustee for the Northern District of

Georgia (the "UST") filed a motion for appointment of an examiner (the "Examiner

Motion"), citing the need to investigate and, if necessary, object to certain insider claims

that would "directly impact the return to equity security holders under the debtor's plan."

(Examiner Mot. ¶ 9.)  The Examiner Motion stated that "an examiner is needed to

investigate, and, if appropriate, object to insider claims . . . *other than any claims held by*

*the Enron creditors (which have already been reviewed by the Committee*)."  (Examiner

Mot. ¶ 9)(emphasis added).  In response, Enron filed a limited objection to the Examiner

Motion, dated December 13, 2002 (the "Limited Objection").  The Limited Objection

noted that Enron, through its equity interest in the New Power Debtors, was an insider

and would therefore be subject to the Examiner's investigations.  Enron argued that with

the appointment of an Examiner, "the never-ending examination of the Enron Creditors'

Claims would begin anew.  This cannot, and should not, be what is intended, for that

would be, in another form, 'triple jeopardy.'"  (Limited Obj. ¶ 13.)  However, Enron

stated that it had sought clarification of the UST's intentions, and had been informed that

the Examiner Motion was not intended to include an examination of Enron's claims and

interests.

On December 19, 2002, the New Power Debtors filed the Debtors First Amended

Chapter 11 Plan (the "First Amended New Power Plan") and the related disclosure

statement (the "Disclosure Statement").  While the Disclosure Statement referenced the

pending Examiner Motion, no explicit mention was made in the First Amended New

Power Plan or Disclosure Statement as to the Examiner being permitted to continue his

investigation of Enron's claims and interests after the confirmation of the First Amended

New Power Plan.  Enron subsequently voted in favor of the First Amended New Power

Plan.

On January 13, 2003, an order was entered approving the Examiner Motion (the

"Examiner Order") and denying the Equity Committee Motion.  Despite the prior

assertion made by Enron in the Limited Objection that the UST had indicated the

Examiner Motion was not intended to include an examination of Enron's claims, and the

fact that the Examiner Motion itself stated that the Examiner would investigate claims

"other than any claims held by the Enron creditors" (Examiner Mot. ¶ 9), the Examiner

Order specifically stated that the examiner appointed thereunder (the "Examiner") was

authorized to investigate and take action with respect to, among other things "(a) Whether

any claim asserted by any of the Enron Parties should be recharacterized as equity; (b)

Whether the Interests of the Enron Parties Interests [sic] in Class 9 and Class 11 are valid

. . . ."  (Examiner Order 2.)  The Examiner's mandate under the Examiner Order also

extended to parties other than Enron.[6]  The Examiner was to file an initial report relating

to his investigation by no later than February 5, 2003.  On January 17, 2003, an order was

entered approving the appointment of Rufus T. Dorsey, IV as Examiner in the New

Power Cases.  On that same date, a hearing was held before the Georgia Bankruptcy

---

[6]  The Examiner Order stated that the Examiner was

> [A]uthorized to investigate, file reports, and take any appropriate action with
> respect to the following issues: (a) Whether any claim asserted by any of the
> Enron Parties should be recharacterized as equity; (b) Whether the Interests of
> the Enron Parties Interests [sic] in Class 9 and Class 11 are valid; (c) Whether
> the proofs of claim and the undisputed scheduled claims against Holdings or
> TNPC which are held or asserted by insiders (other than the Enron Parties) or by
> any non-insiders who are or were officers, directors, or employees of the
> Debtors should be Allowed; and (d) Whether Claims in Class 8 or any Interests
> held or asserted by insiders (other than the Enron Parties) or by any non-insiders
> who are or were officers, directors, or employees of the Debtors should be
> Allowed   . . . .

(Examiner Order 2.)

Court, during which both the approval of the Second Settlement and the appointment of the Examiner were addressed.

On February 11, 2003, the New Power Debtors filed the Modification to Debtors' First Amended Chapter 11 Plan (the "New Power Plan"). The New Power Plan was filed subsequent to the expiration of the deadline for objections to the First Amended New Power Plan. A provision in the New Power Plan stated that the Examiner Order was to remain in full force and effect, and that no claim or interest that was the subject of investigation by the Examiner would be allowed without the written consent of the Examiner or the New Power Debtors, or a final order of the Georgia Bankruptcy Court. (New Power Plan § 12.1.)

On February 14, 2003, an order (the "Second Settlement Order," and together with the First Settlement Order, the "Settlement Orders") was entered approving the settlement of the Claim Objection (the "Second Settlement," and together with the First Settlement, the "Settlements"), pursuant to Bankruptcy Rule 9019. While the matter had been addressed by the Georgia Bankruptcy Court at the hearing held on January 17, 2003, the transcript indicates that the UST was granted an additional five days' of review, at which point the Second Settlement Order was submitted to the Georgia Bankruptcy Court. (New Power Hr'g Tr. 8: 6 - 9: 16, Jan. 17, 2003.) Both the UST and counsel to the Committee were provided with formal notice of the Second Settlement, with each signing a "Reviewed by" line on the Second Settlement Order. The Second Settlement provided for the payment of $137,000

> in full satisfaction of any and all of the Enron Creditors' claims
> that remain under or arise out of the Note, including, without
> limitation, the Enron Creditors' claim for costs . . . Upon their
> receipt of the Settlement Sum, all of the Enron Creditors' claims
> against the Debtors, arising from or relating to the Note that have

been made or could in the future be asserted under the Note, shall
be deemed paid in full.

(Second Settlement ¶ 1).  Upon receipt of the sum, the Enron Creditors were required to

withdraw all proofs of claim that they had filed in the New Power Debtors' cases, and

execute UCC-3 Termination Statements to release their security interest in all New Power

collateral.[7]  The Second Settlement specifically provided that there were no additional

terms to the agreement, and made no mention of approval for the Second Settlement

being granted on an interim basis.  The Second Settlement Order granted the parties the

authority to take any and all actions needed to implement and consummate the

agreement, and provided that the Georgia Bankruptcy Court retained jurisdiction over the

New Power Debtors and Enron with respect to matters related to or arising from

implementation of the Second Settlement Order.

On the same day, February 14, 2003, the Georgia Bankruptcy Court entered an

order extending the Examiner's time to file an initial report to February 19, 2003 (the

"Extension Order").  The Extension Order stated that nothing contained therein "shall

alter or modify any of the remaining terms of the Examiner Order."  (Extension Order 2.)

On February 28, 2003, the Georgia Bankruptcy Court entered an order confirming

the New Power Plan with regard to New Power Company, one of the New Power

Debtors, and on August 15, 2003 with regard to the remaining New Power Debtors.  The

confirmation order was entered over the objections of Enron, as more fully discussed

later in this opinion.  Enron appealed confirmation of the New Power Plan to the District

Court for the Northern District of Georgia (the "District Court"), on the grounds that the

New Power Plan materially and adversely changed the treatment of Enron's interests in

---

[7]  On February 3, 2003, Enron withdrew its proofs of claim filed in the New Power Cases pursuant to the
Notice of Withdrawal of Proofs of Claim Filed By The Enron Creditors.  No objection was filed to the
claim withdrawal.

the New Power Debtors.  *See* 11 U.S.C. § 1127(d) (2005).  The District Court

subsequently issued an order affirming the Georgia Bankruptcy Court's decision, and the

matter is currently before the Court of Appeals for the Eleventh Circuit.

On March 12, 2003, an order was entered with the consent of the Examiner,

amending and clarifying the Examiner Order (the "Amendment," and together with the

Examiner Order, the "Examiner Orders").  The Amendment confirmed, among other

things, which Enron entities would be subject to the Examiner's investigation.

Additionally, the Amendment made clear that the scope of the Examiner's investigation

of the interests of Enron covered the validity, priority, amount, and enforceability of such

interests, including equitable subordination, as well as granting the Examiner standing to

prosecute and pursue whether the Claim asserted by Enron should be recharacterized as

equity, the validity, priority, amount and enforceability of the interests of Enron in New

Power's plan of liquidation and the extent to which such interests should be subordinated.

(Amendment ¶ 10.)

On July 15, 2004, this Court entered the Findings of Fact and Conclusions of Law

Confirming Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors

Pursuant to Chapter 11 of the United States Bankruptcy Code, and Related Relief (the

"Enron Findings of Fact"), in the Enron Cases.  The Examiner objected to Enron's plan

of reorganization (the "Enron Plan") on the basis that the Enron Debtors sought to

"impair, alter or otherwise prejudice the NewPower Examiner's investigation in the

NewPower Cases . . . ."  (Enron Findings of Fact § II(E)(4)(xiv).)  This Court overruled

the Examiner's objection, stating that

> (a) the NewPower Examiner was appointed in the NewPower
> Cases, not the Debtors' Chapter 11 Cases, and the confirmation of
> the Plan does not affect such appointment, (b) *res judicata* and
> collateral estoppel appear to preclude the NewPower Examiner

11

>      from pursuing a re-characterization of the settlement payment, and
>      (c) the claim objection process, and not confirmation of the Plan, is
>      the appropriate platform for the determination of this dispute.

(Enron Findings of Fact § II(E)(4)(xiv).)

On September 24, 2004, the Examiner initiated the current proceeding before this Court. The Examiner's Complaint for Recharacterization of Debt and Equitable Subordination (the "Complaint") requests that Enron's Claim be recharacterized as an equity interest in Class 9 of the New Power Plan. Additionally, the Examiner requests the equitable subordination of any equity interests, including the recharacterized Claim, held by Enron in New Power to all other equity interests. On November 12, 2004, Enron filed the instant motion to dismiss pursuant to Bankruptcy Rule 7012(b)(6) (the "Motion to Dismiss").

Pursuant to a joint ruling of this Court and the Georgia Bankruptcy Court, the Court directed the Examiner, the Enron Debtors and the New Power Debtors to submit to non-binding mediation in relation to several disputes, including this adversary proceeding (the "Mediation"). On September 1, 2005, the mediator appointed in the Mediation (the "Mediator") submitted a Report of Mediator to this Court, indicating that the parties to the Mediation had failed to reach a resolution. The Mediator recommended that the Mediation be adjourned pending resolution of the Motion to Dismiss.

In summary, the following are the key dates with regard to this matter

| | |
|---|---|
| 03/14/01 | Master Agreement Entered Into by Enron and New Power |
| 12/02/01 | Enron Files For Chapter 11 |
| 03/28/02 | First Settlement Order Approved by this Court |
| 06/11/02 | New Power Files For Chapter 11 |
| 07/11/02 | New Power Cash Collateral Order Approved by Georgia Bankruptcy Court |
| 10/07/02 | Deadline for Committee to Object to Enron's Claim |
| 10/07/02 | Enron Files Proof of Claim in New Power Cases |
| 11/04/02 | Extended Deadline for Committee to Object to Enron's Claim |
| 11/05/02 | New Power Pays Principal and Interest on Note |
| 11/19/02 | New Power Files Objection to Enron's Duplicative Claims |

| | |
|---|---|
| 11/25/02 | New Power Files Objection to Enron's Claim |
| 12/02/02 | UST Files Motion For Appointment of Examiner in New Power |
| 12/13/02 | Enron Filed Limited Objection to Examiner Motion |
| 12/19/02 | First New Power Plan Filed |
| 01/13/03 | Examiner Motion Approved By Georgia Bankruptcy Court |
| 01/17/03 | Georgia Bankruptcy Court Hearing On Second Settlement |
| 01/17/03 | Mr. Dorsey Appointed By Georgia Bankruptcy Court As Examiner |
| 02/03/03 | Enron Withdraws Its Proofs of Claim |
| 02/05/03 | Deadline For Examiner Report |
| 02/11/03 | Modified New Power Plan Filed |
| 02/14/03 | Second Settlement Order Entered |
| 02/14/03 | Order Entered Extending Deadline For Examiner Report |
| 02/19/03 | Extended Examiner Report Deadline |
| 02/28/03 | Modified New Power Plan Confirmed. |

## II. Discussion

### A.    *Standard of Review*

#### 1.    *Rule 12(b)(6) Dismissal Standard of Review*

Bankruptcy Rule 7012(b) incorporates Rule 12(b) of the Federal Rules of Civil

Procedure. *See* FED. R. BANKR. P. 7012(b). Rule 12(b)(6) provides, in pertinent part,

that a complaint should be dismissed for "failure to state a claim upon which relief can be

granted." FED. R. CIV. P. 12(b)(6). In considering a Rule 12(b)(6) motion, a court

accepts as true all material facts alleged in the complaint and draws all reasonable

inferences in favor of the plaintiff. *Bolt Elec. Inc. v. City of New York*, 53 F.3d 465, 469

(2d Cir. 1995). The motion to dismiss is granted only if no set of facts can be established

to entitle the plaintiff to relief. *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir.

1992).

Further, although the Court accepts all the factual allegations in the complaint as

true in determining such a motion, the Court is "not bound to accept as true a legal

conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286

(1986). Rather, to withstand a motion to dismiss, the "claims must be 'supported by

specific and detailed factual allegations' . . . ." *Friedl v. City of New York*, 210 F.3d 79,

85-86 (2d Cir. 2000) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

   In determining the sufficiency of a plaintiff's claim for Rule 12(b)(6) purposes, a

court may consider the actual allegations in the complaint, documents attached to the

complaint as an exhibit or incorporated therein by reference, matters of which judicial

notice may be taken, or documents in which plaintiff has notice, possession or knowledge

of and on which plaintiff relied on in commencing the action. *See Chambers v. Time*

*Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Brass v. Am. Film Tech., Inc.*, 987 F.2d

142, 150 (2d Cir. 1993).

   In contrast, when assessing the sufficiency of the complaint, the court does not

consider extraneous material because considering such would run counter to the liberal

pleading standard which requires only a short and plain statement of the claim showing

entitlement to relief. *Chambers*, 282 F.3d at 154. Moreover, the plaintiff would be

prejudiced as it lacked notice that such material would be considered. *Id.* at 153.

Therefore, a court must either exclude such material from its consideration of the Rule

12(b)(6) motion or convert the motion to one for summary judgment providing the parties

the opportunity to conduct discovery and supplement the record with additional material

to support a Rule 56 motion. *Id.* at 154. Nevertheless, where a plaintiff has chosen not to

attach a document to the complaint or incorporate it by reference, and where the plaintiff

relies heavily on such document and it is integral to the complaint, a court may consider

such a document in deciding a Rule 12(b)(6) motion, without converting the proceeding

to one for summary judgment. *Id.* at 153 (citing *Int'l Audiotext Network, Inc. v. Am. Tel.*

*& Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

Finally, to survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them.  *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999).  A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to weigh the evidence that may be offered to support it.  *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998).

Therefore, for purposes of this motion to dismiss, the Court accepts as true all of the material allegations in the Complaint and draws all reasonable inferences in favor of the Examiner.  In determining the sufficiency of Plaintiff's claim for relief, the Court also considers the Examiner Orders, the Master Agreement, the Cash Collateral Order, the Second Settlement and Order and the New Power Plan.  Although not attached, or incorporated by reference, to the Complaint, the Court takes judicial notice of the First Settlement and Order, the Claim Objection, the Examiner Motion, the Limited Objection the Extension Order and the Objection to Confirmation in reviewing the sufficiency of the Examiner's claims.

## B.    *Parties' Contentions*

### 1.    *Examiner's Complaint*

In the first count of the Complaint, the Examiner contends that Enron's advance of $40 million to New Power in October 2001 (the "Credit Extension") pursuant to an amendment of the Master Agreement was made for the purpose of protecting Enron's equity interests in New Power.  The Examiner argues that no disinterested lender would have made such a credit extension to New Power at that time and that through the Credit Extension Enron exercised control over the uses to which New Power could apply these funds.  The Examiner further argues that at its formation New Power was insufficiently capitalized to carry on the type of business in which it was engaged.  As a result, the

Examiner requests that New Power's indebtedness to Enron in the amount of

$28,622,958.30 be recharacterized as equity in New Power, and that New Power be

granted the right to setoff the payment made by New Power to Enron on November 5,

2002, against any distribution to which Enron would be entitled as a holder of interests in

Class 9 of the New Power Plan.  Furthermore, the Examiner requests that Enron be

required to return to the New Power Debtors' estates an amount equal to the difference

between the payment New Power made to Enron, less the amount Enron is entitled to

receive as the holder of interests in Class 9 of the New Power Plan.  The Examiner also

requests that Enron be enjoined from disbursing assets to the extent Enron will be unable

to turn over such amounts to the New Power Debtors' estates.

        In the second count of the Complaint, the Examiner maintains that Enron was an

insider of New Power that was in control of the business and operations of New Power,

and that Enron engaged in inequitable conduct that conferred an unfair advantage on

Enron.  Furthermore, Enron was engaged in a scheme to remove a failing asset from its

portfolio, artificially inflate the value of New Power's stock through false and misleading

information in Enron's knowledge, and generate short term gains and cash to conceal

financial problems and maintain its credit rating and stock price.  In addition, as

referenced above, New Power was insufficiently capitalized and no disinterested lender

would have made the Credit Extension to New Power.  Through its misconduct, Enron

obtained an unfair advantage that was used to its benefit and the ultimate detriment of

New Power and its other equity holders.  Therefore, the Examiner requests that Enron's

equity interests in New Power be subordinated to all other equity interests in New Power,

and that New Power be granted the right to setoff any payment made by New Power to

Enron against any distribution to which Enron would be entitled as a holder of interests in Class 9 of the New Power Plan.

### 2.    *Defendants' Motion to Dismiss*

The Defendants contend that the Complaint should be dismissed pursuant to Bankruptcy Rule 7012(b)(6) for failure to state a claim, since Enron no longer holds an unsatisfied claim in the New Power Cases and any efforts to recharacterize and subordinate the Claim are moot due to the release of claims under the Settlements. Furthermore, the Defendants argue that the Settlement Orders resolved all outstanding disputes under the Master Agreement and are entitled to res judicata effect.

### 3.    *Examiner's Response to Motion to Dismiss*

The Examiner contends that recharacterization and equitable subordination are within the equitable powers of the bankruptcy courts that run in favor of aggrieved parties in a bankruptcy case, and that the New Power Debtors could not act to divest such parties of these rights prior to the New Power Petition Date.  The Examiner also argues that the language of the release contained in the First Settlement does not cover claims for recharacterization and equitable subordination, and that certain of the Defendants[8] are not covered by the release since they were not parties to the First Settlement.  Additionally, the Examiner claims that the release has not yet become effective because the Georgia Bankruptcy Court authorized only provisional payment of the Claim.  Furthermore, the Examiner asserts that the Second Settlement cannot be considered final due to subsequent orders granting the Georgia Bankruptcy Court the right to allow the Claim and the Examiner the authority to review the Claim.  The Examiner believes that Enron has taken a position inconsistent with the contentions made in its objection to confirmation of the

---

[8]    These Defendants include Cortez Energy Services, LLC, McGarret I, LLC McGarret II, LLC, McGarret III, LLC, and EES Warrant Trust.

New Power Plan and subsequent appellate process regarding the confirmation order,
where it argued that the New Power Plan inappropriately extended the Examiner's
powers beyond confirmation.

**C.**      ***Claim Status***

The Examiner's request to recharacterize the Claim as an equity interest is moot,
regardless of the release, due to the prior withdrawal of the Claim pursuant to the Second
Settlement.  The Second Settlement requires withdrawal of the Claim.[9]  In compliance
therewith, Enron withdrew its proofs of claim on February 3, 2003.[10]  Following the
withdrawal of the Claim, the Georgia Bankruptcy Court entered the Second Settlement
Order.[11]

Both prior and subsequent orders reference the Georgia Bankruptcy Court's
retention of jurisdiction over the allowance of Enron's claims, or the power of the
Examiner to challenge such claims.  Specifically, the Cash Collateral Order, entered on
July 11, 2002, states that "[t]he extent to which the Enron Creditors' claim shall
constitute an allowed claim in these bankruptcy cases shall be subject to further order of
this Court."  (Cash Coll. Order ¶ 8.)  In the instant case, the Claim has been withdrawn,
not allowed.  Furthermore, even if the Cash Collateral Order were interpreted to require
the approval of the Georgia Bankruptcy Court to settle and withdraw the Claim, such
approval was granted, without reservation, under the Second Settlement Order.

---

[9]   The Second Settlement states that "Upon receipt of the Settlement Sum, the Enron Creditors
immediately shall prepare and file, at their own expense, all documents required to (i) release and withdraw
all of the proofs of claim that they filed in the Debtors' chapter 11 cases (with the releases to be filed by no
later than February 3, 2003) . . . ."  (Second Settlement ¶ 2.)

[10]   *See supra*, note 7.

[11]   Bankruptcy Rule 3006 states that "[i]f after a creditor has filed a proof of claim an objection is  filed
thereto . . . the creditor may not withdraw the claim expect on order of the court after a hearing on notice to
the trustee or debtor in possession, and any creditors' committee . . . ."  FED. R. BANKR. P. 3006.  While the
Claim was technically withdrawn prior to the Georgia Bankruptcy Court's approval of the Second
Settlement Order, entry of the Second Settlement Order (and consequent approval of the claim withdrawal
under the Second Settlement) served to negate such omission.

In addition to the Cash Collateral Order, the Examiner Order, entered on January 13, 2003, states that the Examiner is authorized to "investigate, file reports, and take any appropriate action with respect to" whether the Claim should be recharacterized and whether the equity interests of Enron are valid. (Examiner Order pg. 2.) This language does not restrict the New Power Debtors from seeking the Georgia Bankruptcy Court's approval of the settlement and withdrawal of the Claim. Further, the Examiner has been given the power to "take appropriate actions," which would include acting with regard to the Second Settlement so as to prevent actions taken thereunder to create a defense to recharacterization of the Claim. However, the Examiner apparently determined that such steps were not necessary.

The New Power Plan, which was confirmed on February 28, 2003, states that "no Claim or Interest that is subject to investigation by the Examiner shall be Allowed without (a) the written consent of the Examiner and the Debtors or (b) a Final Order[12] of the Bankruptcy Court." (Plan ¶ 12.1.) However, the Second Settlement Order, which settled the Claim, constitutes a final order as defined in the Plan. Furthermore, in this instance the Claim has not been allowed, but rather withdrawn.

Finally, the Amendment to the Examiner Order, which was entered on March 12, 2003, reaffirms that the claims and interests of Enron are subject to the Examiner's investigation. (Amendment ¶ 2.) The Amendment also states that the Examiner has standing to prosecute and pursue any rights, claims and remedies to determine whether

---

[12]   A final order is defined under the Plan as "an order or judgment, the operation or effect of which has not been stayed, reversed, modified, or amended and as to which order or judgment the time to appeal, petition for certiorari, or seek reargument, review or rehearing has expired and as to which no notice of appeal, petition for certiorari, or motion for reargument, review or rehearing was timely filed or, if timely filed, the order or judgment has been affirmed by the highest court to which the order or judgment was appealed or from which the reargument or rehearing was sought, or certiorari has been denied, and the time to file any further appeal or to petition for certiorari or to seek further reargument or rehearing has expired." (Plan ¶ 1.29.)

the Claim should be recharacterized and the validity, priority, amount and enforceability

of the interests of Enron, and whether such interests should be subordinated.

(Amendment ¶ 10.)  The Court notes that this decision does not act to negate the mandate

of the Examiner to review the Claim.  The withdrawal and release of the Claim, as well

as the principle of res judicata, constitute defenses available to Enron in this matter.

Having established such defenses, the authority granted to the Examiner to investigate

and commence litigation may well be frustrated, but such defenses were not eliminated as

a result of the authority granted to the Examiner.

Thus, no claim exists to recharacterize as an equity interest.  The Second

Settlement Order remains a final order and has not been appealed.  Despite any argument

that these prior or subsequent orders would be inconsistent with a finding of finality, the

plain language of the Second Settlement Order must be given effect by this Court.  Under

that settlement, the Claim was withdrawn.  Therefore, as stated above, any effort to

recharacterize such claim as an equity interest is moot.

**D.**     ***Release of Claims***

Additionally, by the approval of the Second Settlement, certain provisions of the

First Settlement, including the release, became effective.[13]  As a result, the

recharacterization claim was released as required by the terms of the First Settlement.

The First Settlement states that upon payment of the Note

> Enron, NewPower and each of the parties to the Commodities
> Contracts on behalf of themselves and each of their respective
> Subsidiaries shall be fully, completely and forever released and,
> upon such payment, do hereby so release each other from all
> rights, duties and obligations accrued, contingent or otherwise

---

[13]   The release did not take place until "payment in full of all principal and accrued and unpaid interest under the Note."  (First Settlement ¶ 5(a).)  As discussed below, both Enron and the New Power Debtors have clearly acknowledged that such payment took place.

> (whether past, present, future or otherwise and whether at law or in equity) in and under the Commodities Contracts . . . .

(First Settlement ¶ 5(a).)  The Master Agreement is incorporated in the definition of

Commodities Contracts under the First Settlement.  (First Settlement Schedule A.)  The

Examiner's recharacterization claim is an attempt to use equity to alter the

characterization of the obligation created by the $40 million advance under the Master

Agreement from a loan to an equity investment.  However, obligations under the Master

Agreement have been released.  Therefore, the Court finds that rights flowing from such

obligation, such as the right to bring a claim for recharacterization of such obligation,

have been released.  Nevertheless, as discussed below, the Court finds a claim for

equitable subordination of any equity interest Enron has in the New Power Debtors

would not have been contemplated as being incorporated into the release under the First

Settlement.

### 1.    *Release of Recharacterization Claims*

The Examiner contends that the release is ineffective because the Georgia

Bankruptcy Court and parties in interest to the New Power Debtors' cases were not

involved in the proceeding relating to the First Settlement, which was approved by this

Court prior to the New Power Petition Date.  The Examiner cites the case of *In re*

*American Sweeteners, Inc.*, 248 B.R. 271 (Bankr. E.D. Pa. 2000), as authority for the

proposition that an equitable claim cannot be released prepetition because doing so would

in effect "waive bankruptcy rights that inure to the benefit of unsecured creditors not a

party to that waiver."  *Id.* at 276.

This Court finds that under principles of res judicata, the approval of the First

Settlement bars recharacterization of the Claim.  However, assuming that

recharacterization were not precluded by such principles, *American Sweeteners* can be

distinguished in that it involved a settlement and release that became effective
prepetition. *See id.* at 273. Here, however, the release approved through the First
Settlement Order did not become effective until after the New Power Petition Date, as it
was not triggered until the postpetition payment of "all principal and accrued and unpaid
interest under the Note." (First Settlement ¶ 5(a).) While the New Power Debtors made
a payment to Enron on November 5, 2002 for principal and interest due under the Note, it
was pursuant to the Second Settlement that the Note was deemed paid in full and all
Enron's claims under the Note were satisfied. Upon such full satisfaction, the release
under the First Settlement took effect, and Enron withdrew its claims and released its
liens against New Power.

         Thus, in this case a postpetition agreement, the Second Settlement, has become
the operative document. Indeed, the Settlements are so intertwined as to essentially
integrate the documents with one another. At the time of the Second Settlement Order
and the release, the Georgia Bankruptcy Court, the New Power Debtors, the Committee,
the UST and the Examiner were each involved in the New Power Cases. Therefore, each
had the ability to object to the Second Settlement if they foresaw an issue with regard to
the release or resolution of the Claim. Any issue concerning the releases should have
been raised during this final resolution of the Note. *See Petitioning Creditors of Melon
Produce, Inc. v. Braunstein*, 112 F.3d 1232, 1240 (1st Cir. 1997) ("If the equitable
subordination issue was to be considered at all, it should have been addressed at the time
of the settlement. Otherwise, there is no reason for a settlement, since the settling parties

are neither protected from further unfavorable consequences nor allowed to enjoy the safe

harbor of their settlement arrangement.").[14]

Thus, in this situation, aggrieved parties in the New Power Cases that were not

involved in the First Settlement, including unsecured creditors, were provided with an

opportunity to challenge the effect of the release, since the release did not become

effective until approval of the Second Settlement. Indeed, the UST and counsel to the

Committee both signed the Second Settlement Order and the Examiner had notice and the

opportunity to be heard with respect to that order.

The primary focus of the instant matter is foreclosure of the ability of the New

Power equity holders to pursue a claim for recharacterization. The unsecured creditors in

the New Power Cases are expected to receive a full recovery under the New Power Plan.

Therefore, it is solely the equity holders that stand to benefit from recharacterization of

the Claim. The Examiner was appointed to protect the interests of the equity holders in

the New Power Cases. However, both the UST, who sought the appointment of an

examiner to protect those interests, and the New Power Debtors, approved the Second

Settlement. Further, as stated above, the Examiner had notice and opportunity to be

heard regarding approval of the Second Settlement. The transcript provided by the

Examiner in the Supplemental Response to the Motion to Dismiss, dated September 21,

2005, indicates that he was expected to be at the January 17, 2003 hearing,[15] at which the

entry of the order approving the Second Settlement was presented to the Georgia

Bankruptcy Court. As referenced previously, the Second Settlement approved the

---

[14]    Although the *Melon* case specifically addresses equitable subordination, this Court cites *Melon* for the premise that issues such as recharacterization and equitable subordination should be considered at the time of settlement.
[15]    *See infra*, note 31.

withdrawal of the very claims he was to examine,[16] and yet the Examiner never sought to raise any issue regarding the Second Settlement either through reconsideration or appeal of the Second Settlement Order.  Indeed, Mr. Dorsey had almost a full month after his appointment as Examiner before the Second Settlement Order was entered on February 14, 2003 to raise an issue regarding that order, but apparently determined that it was not necessary to do so.  Therefore, from the date of the appointment of the Examiner on January 17, 2003, the same day as the Georgia Bankruptcy Court's consideration of the Second Settlement (which was then entered on February 14, 2003), the interests of the New Power equity holders have been represented by the Examiner with respect to those matters related to the scope of his appointment.

The fact that the agreement to release claims was reached prepetition, Enron's insider status certainly raises issues as to whether New Power's parties in interest, including the equity holders of New Power, were adequately represented during the negotiation of the First Settlement through the participation of New Power itself in those negotiations.  It is argued that Enron, as an insider of New Power, was in control of New Power's management, and therefore equity interests were not protected.  However, the Court finds (i) Enron's insider status was disclosed in the motion to approve the First Settlement, dated March 1, 2002 (the "First Settlement Motion"), through a detailed description of the equity interests Enron held in the New Power entities  (First Settlement Mot. ¶¶ 10-11.); (ii) by approving the First Settlement, this Court found that the settlement between Enron and New Power was "truly the product of arms' length bargaining and not the product of fraud or collusion." (First Settlement Mot. ¶ 29) (citing *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr. S.D.N.Y. 1998); *In re Best Prods.*

---

[16]    As stated previously, Enron filed a Notice of Withdrawal of the Claim in the New Power Cases, and no objections were made to such withdrawal.  *See supra*, note 7.

*Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994)); and (iii) as far as this Court is aware, there

have been no allegations that New Power's management breached its fiduciary duties to

its constituencies in entering the Settlements.  Here, the Court's finding regarding the

First Settlement forecloses any collateral attack based upon Enron's insider status, unless

such findings were obtained by fraud.  Therefore, during the negotiation of the release,

New Power was required to adequately represent its equity holders so as not to breach its

fiduciary duties.[17]  To find that New Power or its management did otherwise would be in

contravention of this Court's finding with regard to an arms' length negotiation in

relation to the First Settlement, and would require that the First Settlement Order be

challenged, which it clearly has not.  Furthermore, the fact that equity may now be held

by different individuals than those holders subsequent to New Power's entry into the First

Settlement has no legal significance.  Therefore, this Court finds that equity holders are

bound by the consequences of the First Settlement Order regardless of when their

individual interests may have been acquired.

---

[17]   New Power's management was under a fiduciary obligation to act in the interest of its equity holders.
*See Malone v. Brincat*, 722 A.2d 5, 9-10 (Del. 1998).

> An underlying premise for the imposition of fiduciary duties is a separation of
> legal control from beneficial ownership.  Equitable principles act in those
> circumstances to protect the beneficiaries who are not in a position to protect
> themselves.  One of the fundamental tenets of Delaware corporate law provides
> for a separation of control and ownership. The board of directors has the legal
> responsibility to manage the business of a corporation for the benefit of its
> shareholder owners.  Accordingly, fiduciary duties are imposed on the directors
> of Delaware corporations to regulate their conduct when they discharge that
> function.  The directors of Delaware corporations stand in a fiduciary
> relationship not only to the stockholders but also to the corporations upon whose
> boards they serve. The director's fiduciary duty to both the corporation and its
> shareholders has been characterized by this Court as a triad: due care, good
> faith, and loyalty.  That tripartite fiduciary duty does not operate intermittently
> but is the constant compass by which all director actions for the corporation and
> interactions with its shareholders must be guided.

*Id.*  Further, the record establishes that both New Power and Enron were aware at the time of the
First Settlement that New Power was in financial distress, heightening New Power's need to raise
any challenge it could to the loan at issue.  The First Settlement Motion stated that "[i]n
September, New Power advised the Debtors that it was in a distressed financial position."  (First
Settlement Mot. ¶ 12.)

### 2.    *Non-Party Entities*

The Examiner also asserts that certain of the Defendants[18] were not party to the

First Settlement (the "Non-Party Entities"), and are therefore not covered by the release.

The release language, however, specifically incorporates "Enron, New Power and each of

the parties to the Commodities Contracts on behalf of themselves *and each of their*

*respective Subsidiaries*."  (First Settlement ¶ 5(a) (emphasis added).)  Therefore, the

Court finds that to the extent that the Non-Party Entities were parties to the Commodities

Contracts or are subsidiaries of any party to the Commodities Contracts, the language of

the release incorporates them.  Furthermore, the recharacterization count of the

Complaint does not appear to implicate the Non-Party Entities in its request for relief.[19]

### 3.    *Scope of Release*

The Examiner next argues that the language of the release does not apply to

recharacterization or equitable subordination.  The Examiner points to *American*

*Sweeteners*, in which the Bankruptcy Court for the Eastern District of Pennsylvania

found that the dispute in question was "made easier by the fact that the Release is silent

concerning the waiver of the equitable subordination provisions of the Bankruptcy Code,

and [the Movant], in support of its Motion, has produced no evidence to demonstrate that

the parties intended that it should govern the priority of payment as between [the Movant]

and its other creditors." *See American Sweeteners*, 248 B.R. at 277-78.  This Court notes

that the release contained in the First Settlement includes all rights, duties and obligations

"whether at law *or in equity*."  (First Settlement ¶ 5(a)) (emphasis added).  When

---

[18]  *See supra,* note 8.
[19]  Under Count I of the Complaint, which relates to recharacterization, the Examiner requests that relief be
granted against Enron.  Enron is defined in the Complaint as including only Enron Corp., Enron North
America Corp., Enron Energy Services, Inc., Enron Energy Services LLC, and Enron Power Marketing,
Inc.  The Non-Party Entities are included in the definition for "Enron Parties," against which the Examiner
moves under Count II of the Complaint, relating to equitable subordination.

interpreting the language of a general release, one must look to the intent of the parties at the time the language was drafted.[20]  While the release was drafted prior to the New Power Petition Date, the plain meaning of the language of the release was to resolve all rights, duties and obligations in or under the Master Agreement.  As stated earlier, recharacterization of the loan is but one of the issues that could have been raised in relation to the obligations under the Master Agreement.  The power and ability to recharacterize debt exists outside of the Bankruptcy Code,[21] and it could be foreseen that such action would be included in the release under the First Settlement.  Certainly the allowability of the debt underlying the Claim was at issue during negotiation of the First Settlement, as New Power was disputing its liability under the relevant contracts.  Therefore, to the extent a challenge to the debt existed, including recharacterization of such debt, it was foreseeable at the time the parties agreed to the release.[22]  The release of equitable subordination, however, would not have been a consideration of New Power.[23]  The act of recharacterization goes to the validity of the loan itself.  The management of

---

[20]  *See Valley Disposal v. Cent. Vt. Solid Waste Mgmt. Dist.*, 71 F.3d 1053, 1058 (2d Cir. 1995)

> [A] settlement agreement using broad language to effect a mutual release of claims *and* accompanied by a stipulation that the case be dismissed 'without costs to any party' 'is, absent circumstances indicating otherwise, intended to settle all claims involved in the particular litigation, including a claim for attorney's fees.' . . . [A]s in any case involving a settlement, 'it is the intent of the parties which governs' . . . Accordingly, we cited with approval other cases finding no waiver "where the settlement agreement neither mentions fees nor purports to effect a general release of all claims against the defendant.

*Id.* (citing *Brown v. Gen. Motors Corp.*, 722 F.2d 1009, 1012 (2d Cir. 1983).

[21]  *See generally Houston's, Inc. v. Hill*, 826 P.2d 644 (Or. Ct. App. 1992).

[22]  Additionally, as stated previously, New Power's management was aware that New Power was in a precarious financial position at the time of the First Settlement. *See supra*, note 17. Such financial distress would only heighten the New Power management's awareness at that time of the need to raise any issues as to any obligations and rights under the contracts.

[23]  The Court notes that equitable subordination relates to the reordering of priorities amongst creditors themselves, and does not affect the validity of the debt. The management of New Power would have had no reason to consider such action since the debt would still be due, even though the priority of those individuals to which the debt was due would have been reordered.

New Power would be under a duty not to pay an invalid debt, and would therefore have

considered recharacterization as a possible claim.

Additionally, the intent of the parties is made clear through the use of a general

release, which covers all rights, duties and obligations in and under the Commodities

Contracts, whether past, present, future or otherwise.[24]  Therefore, the Court finds that the

release applies to any obligations under the Master Agreement, and any rights flowing

from such obligations, including the Examiner's recharacterization claim for all purposes,

including "setoff."  This intent is further manifested in the recital paragraphs of the First

Settlement, which states that

> the Parties have agreed, on the terms and subject to the conditions
> set forth in this Agreement, to terminate the Commodities
> Contracts and to settle and resolve in accordance with this
> Agreement any and all amounts and obligations that any of the
> NewPower Parties may owe or have to any of the Enron Parties, or
> any and all amounts and obligations that any of the Enron Parties
> may owe or have to any of the NewPower Parties, *without any
> further obligations or liability of any of the Parties to any of the
> Commodities Contract to any other Party thereto*, except for
> obligations of the payor(s) to the payee(s) under the Note . . . .

(First Settlement pg. 1) (emphasis added).  Requiring parties to a settlement to reach a

level of specificity so as to name each cause of action that is covered in a general release

is inapposite to the purpose of a general release, which is meant to apply to *all* claims that

could possibly arise, including recharacterization.  "Where the language . . . is

unambiguous, no need exists to resort to other means of interpretation.  Effect must be

given to the parties' intent as indicated by the language itself.  In the instant case, the

intention of the parties may be gathered from the four corners of the instrument."

*Lombard-Wall Inc. v. Dobbin & Co. (In re Lombard-Wall Inc.)*, 39 B.R. 958, 960 (Bankr.

S.D.N.Y. 1984) (citing *Leslie Fay, Inc. v. Rich*, 478 F. Supp. 1109 (S.D.N.Y. 1979)).

---

[24]   First Settlement ¶ 5(a).

**E.**    ***Res Judicata***

Alternatively, even if the Claim had not been released, the attempt of the

Examiner to recharacterize the Claim for all purposes, including "setoff," is barred by the

res judicata effect of the Settlements and related orders.  The Examiner bases his

argument for recharacterization upon the impropriety of the Credit Extension that took

place pursuant to the Master Agreement.  However, as previously discussed, all claims

that Enron and New Power had against one another in relation to the debt under the

Master Agreement have been released pursuant to the Settlements.  Additionally, the First

Settlement Order in effect found that the First Settlement was the result of an arms'

length negotiation, conferring res judicata status upon issues resolved under the Master

Agreement.  Furthermore, the recharacterization claim was not raised regarding either of

the Settlements.  This, together with preclusive effect of the findings in the First

Settlement Order, prevents re-visitation of the issues resolved pursuant to the Settlement

Orders.

The doctrine of res judicata will preclude a "later litigation if the earlier decision

was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a

case involving the same parties or their privies, and (4) involving the same cause of

action."  *In re Teltronics Serv., Inc.*, 762 F.2d 185, 190 (2d Cir. 1985).  "[T]he test for

deciding sameness of claims requires that the same transaction, evidence, and factual

issues be involved."  *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869, 874

(2d Cir. 1991) (citing *N.L.R.B. v. United Tech. Corp.*, 706 F.2d 1254, 1259 (2d Cir.

1983)).  Additionally, res judicata forecloses all matters that were or could have

previously been litigated.  *In re Teltronics*, 762 F.2d at 190; *see also Rubert v.

Krautheimer (In re Krautheimer)*, 210 B.R. 37, 48 (Bankr. S.D.N.Y. 1997).  Furthermore,

consideration should be given to "whether an independent judgment in a separate

proceeding would 'impair or destroy rights or interests established by the judgment

entered in the first action.'"  *Sure-Snap*, 948 F.2d at 874 (quoting *Herendeen v.*

*Champion Int'l Corp.*, 525 F.2d 130, 133 (2d Cir. 1975)).

Regarding the New Power Examiner's current challenge on behalf of equity, an

effort to recharacterize is barred by principles of res judicata.[25]  That claim should have

been raised at the time the debt was at issue before this Court under the First Settlement.

The disputes settled under the First Settlement clearly related to resolving, among other

things, the debt under the Master Agreement.  Any action or claim relating to this debt

needed to be raised at that time.  Regarding recharacterization, which goes to liability on

the debt, the issue would have to have been raised or should have been raised at the time

of the arms' length negotiations between the parties.  Yet, no party in interest chose to do

so regarding the First Settlement, nor regarding the Second Settlement.[26]  Since this

Court has found that recharacterization could have been raised previously, the failure to

do so prevents recharacterization from being addressed at this time, since res judicata

serves to foreclose all matters that were or could have previously been litigated.  *In re*

*Teltronics*, 762 F.2d at 190 (citing *Comm'r v. Sunnen*, 333 U.S. 591 (1948)); *see also In*

*re Krautheimer*, 210 B.R. at 48.  While the Examiner does not specifically set out which

---

[25]  While the Court does not reach this issue, had the creditors of New Power challenged the Claim on the basis of recharacterization, Enron could have raised the issue that such challenge was barred by the res judicata effect of the First Settlement.  This Court's findings under the First Settlement Order with regard to an arms' length transaction were subject to res judicata effect, and could have foreseeably served as an available defense for Enron with regard to recharacterization.  On the other hand, as referenced above, had the creditors asserted equitable subordination regarding the Claims, the argument of res judicata would seem to be unavailing.

[26]  In contrast, equitable subordination regarding the debt was an action amongst creditors, the outcome of which would not have an effect on New Power.  It is reasonable that New Power would not raise the issue at that time of the First Settlement.  As stated previously, equitable subordination of the debt is only relevant to equity interests if such debt were recharacterized as equity.

elements of res judicata have not been met, this Court will discuss the arguments raised

by the Examiner in the categories to which they can most properly be assigned.

### 1.    *Final Judgment on the Merits*

The Examiner argues that res judicata is inapplicable because an order approving

a settlement pursuant to Bankruptcy Rule 9019 does not constitute a final judgment.

While a split of authority exists on this issue, several courts, including the Bankruptcy

Court for the Southern District of New York, have found that orders approving a

settlement pursuant to Bankruptcy Rule 9019 are final judgments on the merits that are

entitled to res judicata effect.  *In re Gibraltar Res., Inc.*, 210 F.3d 573, 576 (5th Cir.

2000) ("A bankruptcy court's approval of a settlement order that brings to an end

litigation between parties is a 'final' order . . . A settlement agreement approved and

embodied in a judgment by a court is 'entitled to full res judicata effect.'") (quoting *In re*

*W. Texas Mktg. Corp.*, 12 F.3d 497, 500 (5th Cir. 1994)); *Petitioning Creditors of Melon*

*Produce, Inc. v. Braunstein,* 112 F.3d 1232, 1240 (1st Cir. 1997) (Stating that with regard

to approval of settlement agreement pursuant to Bankruptcy Rule 9019, "the principles of

res judicata dictate that the petitioning unsecured creditors should not be permitted to

bring this issue on appeal.  Under res judicata, a final judgment on the merits of an action

precludes the parties or their privies from relitigating issues that were or could have been

raised in that action.") (internal citations omitted); *Bezanson v. Bayside Enter., Inc. (In re*

*Medomak Canning)*, 922 F.2d 895, 900 (1st Cir. 1990) ("Generally, a court-approved

settlement receives the same res judicata effect as a litigated judgment . . . ."); *Freishtat*

*v. Blair (In re Blair)*, 319 B.R. 420, 438 (Bankr. D. Md. 2005) (citing *In re Gibraltar*,

210 F.3d at 576); *In re Glenn*, 160 B.R. 837, 838-39 (Bankr. S.D. Ca. 1993) ("[T]he

order approving the settlement should be given res judicata effect as to those issues that

were decided . . . The trustee's sale of the residence . . . resulted in a settlement of the

trustee's objection to the debtors' homestead exemption and amounts to a final judgment

on the merits.") (citing *McClain v. Apodaca*, 793 F.2d 1031, 1033 (9th Cir. 1986)); *In re*

*Allvend Indus. Snacks By Tom, Inc.*, 29 B.R. 900, 903 (Bankr. S.D.N.Y. 1983)

("Stipulations of settlement, knowingly entered into by parties, and intended to preclude

any further litigation on the claims may be given res judicata effect.") (citing *Wallace*

*Clark & Co., Inc. v. Acheson Indus., Inc.*, 532 F.2d 846 (2d Cir. 1976), *aff'd* 394 F. Supp.

393 (S.D.N.Y. 1975), *cert. denied* 427 U.S. 908, (1976); Wright, Miller & Cooper,

*Federal Practice and Procedure: Jurisdiction* § 4443 at p. 384-5 (1983)); *see also* 10

Collier on Bankruptcy § 9019.01 (15th ed. rev. 2005) ("An order approving a

settlement will be reversed only if the lower court has been guilty of an abuse of

discretion.  Once it has become final, an order approving a settlement has the same res

judicata effect as any other order of a court.").

The Examiner cites the case of *In re Justice Oaks II, Ltd.*, 898 F.2d 1544 (11th

Cir. 1990), as authority for the premise that "a bankruptcy court's order authorizing

settlement of a claim cannot constitute a final judgment on the merits for purposes of

former adjudication."  *Id.* at 1549.  The Examiner states that "with regard to the effect of

the settlement . . . the order entered in the Eleventh Circuit would be governed by the

Eleventh Circuit law by the Court of Appeals . . . What the Court does in the Eleventh

Circuit would have to be governed by Eleventh Circuit law."  (Enron Hr'g Tr. 56: 11-24,

Dec. 9, 2004.).  Thus, the Examiner argues that this Court must look to the Eleventh

Circuit case of *Justice Oaks* in deciding whether the Second Settlement Order constitutes

a final order for purposes of res judicata.  However, the Examiner fails to cite any

authority to support that position, and the Court disagrees with his interpretation of the law.

The Examiner brought the Complaint before this Court, and has acknowledged that this Court "has subject matter jurisdiction over this adversary proceeding based on 28 U.S.C. § 1334 in that this adversary proceeding constitutes a proceeding arising under, in and/or related to the bankruptcy cases of Enron under Title 11 of the United States Code." (Compl. ¶ 14.) Furthermore, the Complaint states that the "adversary proceeding is a core proceeding pursuant to 28 U.S.C § 157." (Compl. ¶ 15.) This matter is not one in which a dispute exists as to which state law should be applied by a federal court. By bringing the adversary proceeding before this Court, the Examiner has subjected himself to this Court's jurisdiction. To the extent controlling precedent exists in the Second Circuit, the Court would be bound to follow such precedent. While another circuit's precedent may well be informative and persuasive, it is not controlling precedent within the Second Circuit.

Further, even if it could be argued that this matter was "transferred" to this Court from the Georgia Bankruptcy Court, the Second Circuit has "previously held that a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit." *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) (citing *Coker v. Pan Am. World Airways, Inc. (In re Pan Am. Corp.)*, 950 F.2d 839, 847 (2d Cir. 1991)). "Although federal courts sometimes arrive at different constructions of federal law, federal law (unlike state law) is supposed to be unitary." *Id.* Thus, "until the Supreme Court speaks, the federal circuit courts are under duties to arrive at their own determinations of the merits of federal questions presented to them . . . ." *Id.* Therefore, a federal court that simply accepts the interpretation of

33

another circuit court without independently addressing the merits is not doing its job. *Id.*

There are issues involving federal law present in this case. Therefore, even in a

"transfer" analysis, the Court should consider case law from within its own federal

circuit.

Furthermore, the Court differs with the underlying reasoning supporting the

*Justice Oaks* decision. In *Justice Oaks*, the Court of Appeals for the Eleventh Circuit

noted that when approving a settlement of claims, a bankruptcy court need only decide

the probability of success of the claims, and not the merit of the claims themselves.

*Justice Oaks,* 898 F.2d at 1549. The Court of Appeals stated that this finding relating to

the probability of success was similar to the finding required in granting a preliminary

injunction. *Id.* The Court of Appeals noted that since the Supreme Court had held that a

preliminary injunction was not a final judgment on the merits, by analogy a bankruptcy

court's order authorizing settlement of a claim should also not be considered final on the

merits. *Id.* (citing *United States v. U.S. Smelting Ref. & Mining Co.*, 339 U.S. 186, 198-

99 (1950)). The Supreme Court's decision in *U.S. Smelting*, which dealt with the

doctrine of law of the case and not res judicata, was based primarily on the fact that the

proceeding being looked to for finality was still ongoing (a temporary injunction had

been issued), and it was clear that no final decisions had been made with regard to the

matter. In its holding, the Supreme Court stated that law of the case was

> not applicable here because when the case was first remanded,
> nothing was finally decided. The whole proceeding thereafter was
> *in fieri* . . . . The fact that an appeal could have been taken from
> the first order of the District Court was not because it was a final
> adjudication but because a temporary injunction had been granted
> in order to maintain the status quo. This was an interlocutory order
> that was appealable because Congress, notwithstanding its
> interlocutory character, had made it appealable.

34

*Id.* (citing 28 U.S.C. § 1253 (1948)).  The Supreme Court further noted that "it requires a

final judgment to sustain the application of the rule of the law of the case just as it does

for the kindred rule of res judicata."  *Id.*  In contrast, an order approving a settlement

agreement pursuant to Bankruptcy Rule 9019 is meant to be a final decision on those

matters relating to the settlement.

     In addition, various courts routinely apply res judicata to cases that have not been

decided on the merits, but are instead settled through the entry of a consent decree.

*Allvend*, 29 B.R. at 903 (citing *O'Cedar Corp. v. F.W. Woolworth Co.*, 66 F.2d 363, 366

(7th Cir. 1933); *Brunswick Corp. v. Chrysler Corp.*, 408 F.2d 335 (7th Cir. 1969); 1B

*Moore's Federal Practice* ¶ 0.409[5] (2d ed. 1982)).  For the foregoing reasons, this

Court adopts the principal that an order by a bankruptcy court approving a settlement is a

final judgment on the merits and is entitled to res judicata effect.

     As previously discussed, the Examiner also argues that the Second Settlement

Order cannot be considered final because various orders in the New Power Cases grant

the Georgia Bankruptcy Court authority to allow, and the Examiner the power to review,

the Claim.  The implication is that these orders prevent the Second Settlement Order from

constituting a final allowance of the Claim or final approval of the Second Settlement.

Despite the Examiner's argument as to what the intent of the Georgia Bankruptcy Court

may have been with regard to the prior and subsequent orders, the Second Settlement

Order does not indicate that approval of the Second Settlement is interim in nature, and

makes no reference to obtaining final approval of the Second Settlement or payment of

the Claim at a later date.  Furthermore, the Second Settlement does not attempt to allow

the Claim in opposition to the authority of the Examiner or the Georgia Bankruptcy

Court.  Rather, it requires that the Claim be withdrawn, and resolves the matter outside of

the bankruptcy claims reconciliation process. Neither the Cash Collateral Order nor the

Examiner Orders set forth limitations on the power of the New Power Debtors and Enron

to resolve the matter through withdrawal of the Claim. The Georgia Bankruptcy Court,

by approving the Second Settlement, specifically authorized the withdrawal of the

Claims. There was no reservation of rights, nor has there been established that any

inherent authority exists, to reinstate the Claim for the purpose of a challenge by the

Examiner.

      The Examiner argues that the payments made to Enron on the Note pursuant to

the Cash Collateral Order were provisional in nature. The language quoted by the

Examiner from the Cash Collateral Order to support this proposition[27] relates not to

provisional payment of the Note, but rather to final allowance of the Claim. It is clear

that the Note has been paid in full. The New Power Debtors themselves acknowledge

that they have "paid the Enron Creditors the full amount of the principal, plus all accrued

interest, under the Note." (Claim Objec. ¶ 11.) Additionally, the Second Stipulation

specifically states that "all of the Enron Creditors' claims against the Debtors, arising

from or relating to the Note that have been made or could in the future be asserted under

the Note, shall be deemed paid in full." (Second Settlement ¶ 1.) Neither the Second

Settlement nor the Second Settlement Order state that the payments made on November

5, 2002 or the additional $137,000 paid for attorneys' costs were interim in nature, or

remain subject to the Cash Collateral Order. Thus, even if the payments were provisional

in nature when originally made on November 5, 2002, there is no indication in the

Second Settlement that such payments were to remain provisional and have not been

finalized pursuant to the Second Settlement Order. This is further illustrated by the fact

---

[27] "The extent to which the Enron Creditors' claim shall constitute an allowed claim in these bankruptcy cases shall be subject to further order of this Court." (Cash Coll. Order ¶ 8.)

that the Second Settlement was clearly intended to constitute a final resolution of Enron's

claims under the Note, and not simply a resolution of the amount of attorneys' fees due to

Enron.[28]  Therefore, the Court finds that the Settlements constitute final judgments on the

merits.

### 2.      *Court of Competent Jurisdiction*

Courts of competent jurisdiction entered the Settlement Orders.  No challenge has

been raised to this Court's jurisdiction to enter the First Settlement Order.  As stated in

the motion to approve the First Settlement, this Court had jurisdiction over the matter

pursuant to 28 U.S.C. §§ 157 and 1334.[29]  The matter constituted a core proceeding under

28 U.S.C. § 157(b), and venue was proper pursuant to 28 U.S.C. §§ 1408 and 1409.[30]

Neither has a challenge been made with regard to the Georgia Bankruptcy Court's

jurisdiction to enter the Second Settlement Order.  Therefore the Court finds that this

Court and the Georgia Bankruptcy Court were courts of competent jurisdiction to enter

the Settlement Orders.

### 3.      *Same Parties or Privies*

Additionally, this case involves the same parties or their privies, as required under

the doctrine of res judicata.  The Examiner Order was entered on January 13, 2003,

several days prior to approval of the Second Settlement at the hearing held before the

Georgia Bankruptcy Court on January 17, 2003.  Furthermore, the Georgia Bankruptcy

Court addressed the appointment of Mr. Dorsey as the Examiner at the same hearing on

January 17, 2003, and the order appointing Mr. Dorsey as Examiner was entered later

that day.  Mr. Dorsey was fully aware of and able to attend the hearing, and the hearing

---

[28]  The Second Settlement states that the New Power Debtors are to pay Enron the settlement sum "in full satisfaction of any and all of the Enron Creditors' claims that remain under or arise out of the Note . . . ." (Second Settlement ¶ 1.)

[29]  *See* Mot. to Approve First Settlement ¶ 1.

[30]  *See id.*

transcript indicates that he had intended to do so.[31]  The Examiner, therefore, had ample

opportunity to raise issue with the Second Settlement had he decided to do so.[32]  Further,

the Second Settlement Order was not entered until February 14, 2003, giving the

Examiner almost a full month to raise issue with its entry after he had notice that the

Georgia Bankruptcy Court, subject to the five day period afforded the UST to review,

would enter the Second Settlement Order.  Nor did the Examiner seek to reconsideration

of the Second Settlement Order after its entry.  Additionally, the Court notes that the

UST, who sought the appointment of the Examiner and the order directing selection of

the Examiner, consented to the entry of the Second Settlement.

Furthermore, the Examiner was in privity with the New Power management,

which reviewed and consented to the First Settlement.  "[P]rivity may be established by

identification of interests, even where representation of those interests is not authorized."

*Bezanson v. Bayside Enter., Inc. (In re Medomak Canning)*, 922 F.2d 895, 901 (1st  Cir.

1990); *see also Petitioning Creditors of Melon Produce, Inc. v. Braunstein*, 112 F.3d

1232, 1240 (1st Cir. 1997).  One party may bind others based upon such an identification

of interests, so that such party was acting as their virtual representative.  *See In re*

*Medomack,* 922 F.2d at 901.  The Examiner and the New Power management have an

identification of interests, which is that New Power pay only that which it is rightfully

obligated to pay under the Master Agreement.  Through their actions, both challenge the

debt due under the Master Agreement.  The actions of both the Examiner and the New

Power management in this respect inure to the benefit of the estate's equity holders.

---

[31]   In the hearing transcript attached to the Examiner's Supplemental Response to the Motion to Dismiss,
dated September 21, 2005, the New Power Debtors' counsel stated that Mr. Dorsey "is on his way down to
court this morning, presumably with his verification information in the hopes that that order will be entered
shortly and we'll be able to proceed with that . . . I think he's actually a little bit late, so he may come
before we finish this morning."  (New Power Hr'g Tr. 4: 19 - 5: 3, Jan. 17, 2003.)
[32]   According to the Certificate of Service, filed on February 27, 2003 by counsel to the New Power
Debtors, Mr. Dorsey was served with a copy of the Second Settlement Order.

Such identity of interests between the New Power management and the Examiner establishes privity for purposes of res judicata. *In re Gibraltar Res., Inc.*, 210 F.3d 573, 576-77 (5th Cir. 2000) (noting that creditors that failed to appeal bankruptcy court order approving settlement negotiated by trustee are bound by settlement and not entitled to re-litigate issue resolved in the order). Therefore, the Court finds that the instant case involves the same parties or their privies.

### 4.    *Same Cause of Action*

Furthermore, the issues raised in the Complaint relate to the same causes of action that were in effect dealt with in the First Settlement, and these issues should therefore have been raised at the time of the Second Settlement if they were to be addressed. As previously stated, this Court found the First Settlement was the result of arms' length negotiation. This finding would logically confer res judicata status on the question of the reasonableness of the issues resolved under the First Settlement, including issues with respect to the Master Agreement. Therefore, the issue of whether the Credit Extension made pursuant to the Master Agreement was unreasonable so as to warrant recharacterization of the Claim, has been resolved, effectively on the 'merits,' through the approval of the First Settlement reached by arms' length negotiations. In order for the Examiner's request for recharacterization to succeed, the First Settlement Order would have to be challenged and its findings reversed. However, the issue of equitable subordination of Enron's remaining equity interests in the New Power Debtors is not subject to res judicata, as the Examiner's Complaint alleges certain actions on the part of Enron that bear no relation to the various contracts addressed by the First Settlement.[33]

---

[33]   These allegations include that "[e]ach of the Enron Parties was part of, and used collectively by Enron in, an overriding scheme to remove a failing asset from its portfolio, artificially inflate the value of New Power's stock through the dissemination of false and misleading information within Enron's knowledge,

Therefore, the count in the Complaint regarding equitable subordination of Enron's existing equity interests in the New Power Debtors survives the Motion to Dismiss.

Additionally, the issues resolved under the Settlements involved the same cause of action at issue in the recharacterization count of the Complaint. "[T]he test for deciding sameness of claims requires that the same transaction, evidence, and factual issues be involved." *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869, 874 (2d Cir. 1991) (citing *N.L.R.B. v. United Tech. Corp.*, 706 F.2d 1254, 1259 (2d Cir. 1983)). The basis of the recharacterization count in the Complaint involves the same transaction, evidence, and factual issues under the Master Agreement as was dealt with in the Settlements. Under the Settlements, the ultimate transaction and issues being resolved was the parties' liabilities to one another under various contracts, including the Master Agreement. Here, under the Complaint the same issue of liability under and resulting from the Master Agreement is being addressed. Therefore, the Court finds that the issues raised in the Complaint with regard to recharacterization relate to the same causes of action that were within the ambit of the First Settlement, and that these issues should have been raised at that time or the time of the Second Settlement if they were to be addressed.

**5.    *Impairment of Rights***

The Second Circuit has stated that when determining whether the standard for res judicata has been met, a court should consider "whether an independent judgment in a separate proceeding would 'impair or destroy rights or interests established by the judgment entered in the first action.'" *Sure-Snap*, 948 F.2d at 874 (quoting *Herendeen v. Champion Int'l Corp.*, 525 F.2d 130, 133 (2d Cir. 1975)). Any judgment in favor of the

---

and generate desperately needed short term gains and cash to conceal its financial problems and maintain its credit rating and stock price." (Complaint ¶ 326.)

recharacterization claim contained in the Complaint would clearly impair or destroy

rights or interests established pursuant to the Settlement Orders, and nullify the

agreements approved pursuant to those orders.  "The finality of court-approved

settlements such as this one is important, especially to the efficient administration of the

estate and to reassure settling parties that the trustee will not relitigate the settled claims."

*Petitioning Creditors of Melon Produce, Inc. v. Braunstein*, 112 F.3d 1232, 1240 (1st Cir.

1997) (citing *Bezanson v. Bayside Enter., Inc. (In re Medomak Canning)*, 922 F.2d 895,

901(1st Cir. 1990)).  Therefore, the Court finds that the importance of finality and

resolution through settlement is a factor that should be weighed in addressing the relief

requested in the Complaint.  That factor weighs in favor of Enron here.

### 6.    *Defendant's Appeal of New Power's Plan Confirmation*

The Examiner requests that this Court take judicial notice of the arguments made

by the Defendants in their various appeals of the Georgia Bankruptcy Court's

confirmation of the New Power Plan.  With regard to Enron's appeal to the District

Court, the Examiner states that "there was no way to reconcile Enron's position on appeal

(i.e., the Confirmation Order improperly 'extended' the pre-existing authority of the

Examiner to bring the claim) with its position before this Court (i.e., that the right to

bring the claim was non-existent before the Confirmation Order was even entered.)"

(Supplemental Resp. Mot. to Dismiss 2.)  This Court finds that the position taken by

Enron in these proceedings is not mutually exclusive of the position argued in Enron's

appeal to the District Court.  Enron's argument before this Court is not that the right of

the Examiner to bring the claim did not exist before the Confirmation Order, as the

Examiner has characterized it to be.  Indeed, in the Limited Objection, Enron appears to

acknowledge that with appointment of the Examiner, "the never-ending examination of

the Enron Creditors' Claims would begin anew." (Limited Obj. ¶ 13.) Rather, in its

Motion to Dismiss and subsequent arguments before this Court, Enron puts forth various

affirmative defenses that such claim has been frustrated by the effect of the Settlement

Orders.[34]

       Additionally, the Examiner contends that Enron has argued before the Court of

Appeals for the Eleventh Circuit that the "New Power Plan, as amended, and the

Confirmation Order are the actual documents that granted the Examiner standing for the

first time to pursue the recharacterization and equitable subordination claims against

Enron." (Supplemental Resp. Mot. to Dismiss 2.) It does not appear from the excerpts

provided by the Examiner that Enron has argued that the Examiner completely lacked

standing to bring an action, but rather that the Examiner lacked the independent authority

to bring an action post-confirmation without first consulting the New Power Debtors or

the Georgia Bankruptcy Court. This, as well, is not mutually exclusive from the

argument made by Enron before this Court, which is that any power the Examiner may

have had, whether derivative or not, has been frustrated by the Settlement Orders.

### III.  Conclusion

       Assuming as true all of the material allegations of the Examiner's Complaint, the

Court concludes that the Claim cannot be recharacterized, due to the withdrawal of the

Claim, the release of claims under the Master Agreement and the res judicata effect of the

Settlements and related orders. However, Enron's equity interests remain subject to a

claim for equitable subordination before this Court.

       Therefore, based upon the foregoing, Count I of the Complaint is dismissed.

Count II of the Complaint is dismissed as moot regarding that portion seeking equitable

---

[34]  Enron states that "each of the Examiner's claims were mooted by NewPower's release of those claims
and, further, are barred by res judicata." (Mot. to Dismiss ¶ 2.)

subordination of the Claim if it were recharacterized as an equity interest.  Dismissal of

that portion seeking equitable subordination of Enron's existing equity interest in New

Power is denied.  The parties are to contact the Court to schedule a status conference date

to address all remaining issues, including reconvening mediation.

Counsel for the Enron Debtors is to settle an order consistent with this Court's

Opinion.

Dated:  New York, New York
         January 26, 2006

s/Arthur J. Gonzalez
UNITED STATES BANKRUPTCY JUDGE